Livia I. GUILLERMETY, Glenn
D. Edgmon and Fiore
Botta, Plaintiffs,

v.

SECRETARY OF EDUCATION OF
THE UNITED STATES and Secretary
of Treasury of the United States, De-
fendants.

No. 01–CV–74904–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 27, 2002.

Jennifer L. Hartke, Pontiac, MI, Michael Tankersley, Washington, DC, Deanne Loonin, Boston, MA, for plaintiffs.

Jacqulyn Hotz, Detroit, MI, for defendants.

**ORDER (1) GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF EDGMON AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF GUILLERMETY; AND (2) GRANTING, *SUA SPONTE*, SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS WITH RESPECT TO PLAINTIFF GUILLERMETY'S CLAIMS**

BORMAN, District Judge.

This is a case concerning the administrative offset of Plaintiffs' Social Security benefits by the Secretary of Treasury, pursuant to 31 U.S.C. § 3716, to collect outstanding student loan balances owed to the United States. The Court, by order dated March 28, 2002, granted in part and denied in part Plaintiffs' motion for preliminary

injunction.[1] Now before the Court is Plaintiffs' motion for summary judgment. The motion, like the motion for preliminary injunction, presents an issue of first impression in the federal courts—the Court must decide whether the Secretary of Treasury may offset a recipient's Social Security benefits in order to collect student loans owed to the United States which allegedly have been outstanding for more than ten years. In doing so, the Court must reconcile an apparent conflict between three statutes: (1) 42 U.S.C. § 407; (2) 31 U.S.C. § 3716; and (3) 20 U.S.C. § 1091a.

The Court heard oral argument on July 30, 2002. Having considered the entire record, and for the reasons that follow, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for summary judgment. Specifically, the Court GRANTS Plaintiffs' motion with respect to Plaintiff Edgmon, and DENIES Plaintiffs' motion with respect to Plaintiff Guillermety.[2] Furthermore, the Court, *sua sponte*, GRANTS summary judgment in favor of Defendants with respect to Plaintiff Guillermety's claims. Accordingly, IT IS ORDERED that the Secretary of Treasury of the United States is hereby PERMANENTLY RESTRAINED and ENJOINED from offsetting Plaintiff Edgmon's Social Security benefits to collect his outstanding and delinquent Federal Perkins Loan.

## FACTS

On March 28, 2002, the Court granted in part and denied in part Plaintiffs' motion for preliminary injunction. *See Guillermety v. Secretary of Education*, No. 01–74904 (E.D.Mich. Mar.28, 2002) (attached as Appendix A). The facts, which were largely uncontested at that time, are adequately documented in the Court's prior order. The Government has, however, provided supplemental information, further documenting the Plaintiffs' outstanding and delinquent loans.

Plaintiff Guillermety currently has five outstanding and delinquent student loans.

| Loan Type | Date | Loan Amount | Reinsurance Paid | Assigned to Educ. |
| --- | --- | --- | --- | --- |
| Perkins | 10/31/88 | $ 750 | Not Applicable | 8/31/97 |
| Perkins | 1/7/91 | $ 935 | Not Applicable | 8/31/97 |
| Federal Stafford | 12/2/85 | $2,500 | 5/5/93 | 1/12/96 |
| Federal Stafford | 10/26/88 | $2,500 | 9/23/92 | 12/25/96 |
| Federal Stafford | 9/4/90 | $3,276 | 9/24/93 | 12/25/96 |

Plaintiff Edgmon currently has one outstanding and delinquent student loan—a

---

1. Plaintiffs filed a notice of appeal with respect to this order on July 22, 2002. The appeal is currently pending before the Sixth Circuit. *See Guillermety v. Secretary of Education*, No. 02–1920 (6th Cir.).

2. Pursuant to a letter filed by Plaintiffs' counsel on August 29, 2002, Plaintiff Botta received a disability discharge of his loan and will be filing a motion to voluntarily dismiss his claims pursuant to Federal Rule of Civil Procedure 41(a). Consequently, the Court will limit its review to Plaintiffs Guillermety and Edgmon.

Federal Perkins loan (original principal totaled $2,590) distributed to Plaintiff at various times during the years 1976 and 1977. The loan was assigned to the Department of Education on February 1, 1990.

## ANALYSIS

### A. Standard of Review

Pursuant to the Federal Rules of Civil Procedure, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the non-moving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed.1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.; Feliciano v. City of Cleveland,* 988 F.2d 649, 654 (6th Cir.1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.,* 749 F.2d 1205, 1210–11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548 (1986). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd Cty. Bd. of Ed.,* 106 F.3d 135, 145 (6th Cir.1997); *see also Anderson,* 477 U.S. at 252, 106 S.Ct. 2505 (holding that the non-moving party must produce more than a mere scintilla of evidence to survive summary judgment).

### B. Law of the Case

Both parties acknowledge that there is no dispute concerning the underlying facts of this case. Moreover, as noted in the Court's prior order, the issues before the Court—issues of first impression—involve two abstract legal issues: (1) when does

the statute of limitations contained in 31 U.S.C. § 3716(e)(1)—"claim under this subchapter that has been outstanding for more than 10 years"—begin to run; and (2) can the Secretary of Treasury offset a recipient's Social Security benefits in order to collect student loans owed to the United States after the ten year period codified in section 3716(e)(1) has expired. The Court previously held that (a) the limitations period begins to run when the government's right to collect the debt first accrues, and (b) the government may not offset a recipient's Social Security benefits in order to collect student loans that have been outstanding for more than ten years from the date the government's right to collect the debt first accrues. *See Guillermety v. Secretary of Education,* 01–74904 (E.D.Mich. Mar. 28, 2002).

The same legal issues are now before the Court on Plaintiffs' motion for summary judgment. Because briefing for the motion for summary judgment was completed at approximately the same time that the Court issued its previous decision, the parties have not addressed the "law of the case" doctrine. However, because the legal issues are identical to those previously before the Court, the Court must determine whether law of the case is applicable in the instant case.

■ The "law of the case" doctrine is an amorphous concept. *Wilcox v. United States,* 888 F.2d 1111, 1113 (6th Cir.1989). The doctrine precludes a court from reconsidering "identical" issues. *McKenzie v. BellSouth Telecomms., Inc.,* 219 F.3d 508, 512 n. 3 (6th Cir.2000); *Cohen v. Brown Univ.,* 101 F.3d 155, 167 (1st Cir.1996) ("The law of the case doctrine precludes relitigation of the legal issues presented in successive stages of a single case once those issues have been decided."). The doctrine serves to (1) prevent the continued litigation of settled issues; and (2) to

assure compliance by inferior courts with the decisions of superior courts. *E.E.O.C. v. United Ass'n of Journeymen and Apprentices of the Plumbing & Pipefitting Indus. of the United States and Canada, Local No. 120,* 235 F.3d 244, 249 (6th Cir.2000) (quoting *United States v. Todd,* 920 F.2d 399, 403 (6th Cir.1990)).

■ However, a court must remember that the law of the case doctrine "is 'directed to a court's common sense' and is not an 'inexorable command.' " *McKenzie,* 219 F.3d at 512 n. 3; *see also A.M. Capen's Co. v. American Trading and Prod. Corp.,* 202 F.3d 469, 472 (1st Cir.2000) ("[T]he law of the case doctrine only directs our discretion; it does not limit our power."). A court may reconsider a ruling if: (1) substantially different evidence is raised on subsequent trial; (2) a subsequent contrary view of the law is decided by the controlling authority; or (3) the prior decision is clearly erroneous and would work a manifest injustice. *McKenzie,* 219 F.3d at 512 n. 3.

■ Moreover, as a general rule, a decision made on a party's motion for preliminary injunction does not constitute law of the case. *Wilcox,* 888 F.2d at 1114. The Sixth Circuit has recognized that because motions for preliminary injunctions are generally utilized to maintain the relative positions of the parties until a trial on the merits, and are, thus, quickly initiated in order to preserve the status quo, "a preliminary injunction is customarily granted on basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* at 1113. Furthermore, because preliminary injunctive relief is an extraordinary remedy, plaintiffs are required to satisfy a stringent burden of persuasion—a plaintiff must establish a "strong" likelihood of success on the merits; however, in order to survive a motion for summary judgment, a plaintiff

must merely create a jury issue—i.e., a genuine issue of material fact exists, irrespective of whether there is a strong likelihood that the plaintiff will ultimately succeed on the merits. *Leary v. Daeschner,* 228 F.3d 729, 739 (6th Cir.2000). Thus, a decision as to the "likelihood of success" on a motion for preliminary injunction does not equate to a decision as to the "success" of the merits of a party's claim. *University of Texas v. Camenisch,* 451 U.S. 390, 394–95, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *Wilcox,* 888 F.2d at 1114.

■ With this in mind, the Court concludes that, as a technical matter, the law of the case doctrine is inapplicable for purposes of Plaintiffs' motion for summary judgment. The preliminary injunction was heard on an accelerated basis, and consequently, the parties did not have a chance to completely develop all of their legal arguments at the time of the prior hearing.

However, the Court also finds that most of the arguments currently before the Court, as set forth in the parties' briefs supporting and/or opposing Plaintiffs' motion for summary judgment, are identical to those made during the prior hearing. In fact, Plaintiffs' brief in support of their motion for preliminary injunction incorporated the arguments made in their motion for summary judgment—both motions were filed on February 5, 2002. (Pl.'s Br. in Support of Mtn. for Preliminary Injunction at 2—"Plaintiffs' claim on the merits is straightforward and presents a strictly legal issue. This argument is summarized here, but is presented in detail in Plaintiffs' motion for summary judgment, which is being resubmitted to the Court contemporaneously with this Motion."). Because these arguments were carefully scrutinized by the Court, the Court reaffirms the findings and conclusions made in its March 28, 2002 Order—attached as Appendix A. Simply stated, the Court, after reviewing the entire record, finds no reason to reverse its previous holding. In reaching this conclusion, the Court rejects Plaintiffs' supplemental arguments concerning the statute of limitations as contained in 31 U.S.C. § 3716(e)(1).

## C. 31 U.S.C. § 3716(e)(1)—Claims Outstanding for More than 10 Years

31 U.S.C. § 3716(e)(1) provides: "This section does not apply (1) to a claim under this subchapter that has been outstanding for more than 10 years." The Court previously held that this limitations period begins to run when the government's right to collect the debt first accrues. *See Guillermety, supra* at 734–736. Plaintiffs disagree with this conclusion, arguing that the Court's construction of the term "claim" is inconsistent with prior precedent interpreting the federal priority statute, 31 U.S.C. § 3713—Plaintiffs contend that the priority statute has interpreted the term to extended to claims or debts even if they are not currently held by the United States. (Pl.'s Supplemental Br. at 2, 8—"Student loans under the loan programs at issue here qualify as 'claims' from the inception of the debt."). Plaintiffs also argue that the Treasury regulation relied upon by this Court—31 C.F.R. § 901.3(a)(4)—is inconsistent with other language contained in the statute. In particular, Plaintiffs believe that the term "outstanding" refers to loans that are not past due and have not yet been assigned to the United States—i.e., the statute of limitations begins to run when the loan funds are distributed to the student.

### 1. "Claim" Pursuant to 31 U.S.C. § 3716

■ Plaintiffs are correct in one respect—the normal rule of statutory construction dictates that when Congress uses identical words in two different places in a statute, the words are usually read to

mean the same thing in both places. *Commissioner of Internal Revenue v. Lundy,* 516 U.S. 235, 250, 116 S.Ct. 647, 133 L.Ed.2d 611 (1996). This is buttressed by 31 U.S.C. § 3701(b)(1), which states that in Subchapter II, "claim" shall mean "any amount of funds or property ... owed to the Untied States."

■■ However, the cases interpreting section 3713 counsel against, rather than in favor of Plaintiffs' interpretation. Section 3713 provides:

A claim of the United States Government shall be paid first when—

(A) a person indebted to the Government is insolvent and—

(i) the debtor without enough property to pay all debts makes a voluntary assignment of property;

(ii) property of the debtor, if absent, is attached; or

(iii) an act of bankruptcy is committed; or

(B) the estate of a deceased debtor, in the custody of the executor or administrator, is not enough to pay all debts of the debtor.

31 U.S.C. § 3713(a)(1). Thus, the government is entitled to priority if (1) a debt is due to the United States Government; (2) by a person who is insolvent; and (3) that person either voluntarily assigns property, an absent debtor has his or her property attached, or an act of bankruptcy is committed. *Cerilli v. Newport Offshore, Ltd.,* 624 A.2d 835, 838 (R.I.1993) (citing *In re Metzger,* 709 F.2d 32, 33–34 (9th Cir. 1983)). Furthermore, it is clear that the debt owed to the government must be in existence at the time the insolvent debtor assigns the property, an absent debtor has his or her property attached, or an act of bankruptcy occurs. *Id.; see also United States v. Brocato,* 403 F.2d 105, 108–09 (5th Cir.1968) ("All of the authority with which this Court is familiar requires the United States, or its agencies, have either actual legal title to the debt, or 'beneficial ownership' of the debt prior to the filing of the bankruptcy petition.").

Government claims, which are wholly contingent upon happenings after the act of bankruptcy, do not constitute claims under the priority statute. In *Commonwealth of Massachusetts v. United States,* 333 U.S. 611, 68 S.Ct. 747, 92 L.Ed. 968 (1948), the United States Supreme Court stated in dicta: "And it is at least doubtful on the statute's wording that obligations wholly . contingent for ultimate maturity and obligation upon the happening of events after insolvency can be said to fall within the reach of 'debts due' as of the time of insolvency." *Id.* at 626–27, 68 S.Ct. 747.

■ This statement was clarified by the U.S. Supreme Court in 1975—fixed but unliquidated debts constitute claims of the government for purposes of the priority statute. *See United States v. Moore,* 423 U.S. 77, 96 S.Ct. 310, 46 L.Ed.2d 219 (1975). In *Moore,* the debtor defaulted on a government contract prior to insolvency. *Id.* at 78, 96 S.Ct. 310. However, the precise amount of the government's claim was not set until after the act of bankruptcy occurred. *Id.* at 79, 96 S.Ct. 310. After citing the above passage from *Commonwealth of Massachusetts,* the Court stated: "But the obligation here, and in the cases cited, was fixed and independent of 'events after insolvency'; only the precise amount of that obligation awaited future events." *Id.* at 85, 96 S.Ct. 310.

■ This holding is entirely consistent with this Court's interpretation of the word "claim." The priority statute is only applicable to fixed debts owed to the United States government at the time the act of bankruptcy occurs. While the debt may

be unliquidated—i.e., the debt is not a sum certain—there clearly must be a fixed debt owed to the United States government at the time of the act of bankruptcy. Contrary to Plaintiffs' assertion, this does not support the conclusion that a debt can be a claim of the United States "even if the debt is not yet owed to, or enforceable by, the United States." (Pl.'s Supplemental Br. at 2.) As noted by the Supreme Court of Rhode Island:

If at the time of the act of bankruptcy or other event that triggers the statute a person owed a debt to the United States, with only the amount of the debt uncertain and unliquidated, the United States is entitled to priority. If, however, the existence of the debt obligation is dependent on events that occur after the act of bankruptcy, the United States is not entitled to priority pursuant to § 3713(a).

*Cerilli,* 624 A.2d at 839. Clearly, only fixed debts that are owed to the United States qualify for priority under 31 U.S.C. § 3713.

Plaintiffs' reliance on *Small Bus. Admin. v. McClellan,* 364 U.S. 446, 81 S.Ct. 191, 5 L.Ed.2d 200 (1960), is misplaced. There, a $20,000 loan was made to the debtor. *Id.* at 447, 81 S.Ct. 191. Of this amount, $5,000 came from a private bank, and $15,000 came directly from the United States Treasury. *Id.* Thus, the SBA was not acting as a guarantor—it directly funded 75% of the total loan amount. Thereafter, an involuntary bankruptcy petition was filed against the debtor. *Id.* at 447–48, 81 S.Ct. 191. The Court held that the government was entitled to priority. The Court found this conclusion to be consistent with prior precedent—priority only attaches to those debts owing to the United States on the date of commencement of bankruptcy proceedings and not debts that come into existence after that date:

But this requirement ... is fully met here by virtue of the fact that the debt due the Administration arises out of the loan made jointly by the bank and the United States nine months prior to the petition in bankruptcy. Such beneficial ownership of three-fourths of the debt for which priority is asserted belonged to the Administration from the date of the loan, it is immaterial that formal assignment of the note evidencing the debt was not made by the bank until after the filing of the petition.

*Id.* at 450, 81 S.Ct. 191.

Unlike *McClellan,* the government did not have beneficial ownership of the student loans at issue until the loans were assigned to the Department of Education and/or when the Department of Education paid the reinsurance obligation. As noted in the Court's March 28, 2002 Order, Federal Stafford and PLUS loans are originated by private lending institutions such as banks and credit unions. The loans are insured by guaranty agencies, generally state and nonprofit private institutions. The guaranty agency only has a contractual right against the United States for reimbursement with respect to losses on the unpaid principal balance and accrued interest on the loan. Thus, the Department of Education does not have a beneficial ownership in the private student loan until the guaranty agency exercises its contractual right for reimbursement on a defaulted student loan.

Similarly, Federal Perkins loans are made directly by the debtor's college or university. While the federal government provides initial contributions to help capitalize a university's loan fund, the government does not have a right to amounts owed on loans made—amounts owed are repayable solely to the college or university. The Department of Education only obtains beneficial ownership of the loan if

the college or university, in its discretion, voluntarily chooses to refer, transfer, or assign the loan for collection.

Two cases illustrate the distinction. *See United States v. Marxen,* 307 U.S. 200, 59 S.Ct. 811, 83 L.Ed. 1222 (1939) and *United States v. Brocato,* 403 F.2d 105 (5th Cir. 1968); *see also Lakeshore Apartments, Inc. v. United States,* 351 F.2d 349, 353 (9th Cir.1965); *City of New York v. United States,* 414 F.Supp. 90, 92 (E.D.N.Y.1975).

In *Marxen,* a California bank made a loan to a brewing company. *Marxen,* 307 U.S. at 201, 59 S.Ct. 811. The California bank was insured by the Federal Housing Administrator ("FHA"). *Id.* at 201 & n. 1, 59 S.Ct. 811. Under the insurance contract, the bank had to wait 60 days after default before making a claim with the FHA. *Id.* at 201, 59 S.Ct. 811. The brewing company defaulted on the loan on February 2, 1937 and filed for bankruptcy on April 5, 1937. *Id.* The bank, however, did not present the claim to the FHA until July 3, 1937—the claim was ultimately paid by the FHA on August 4, 1937. *Id.* The United States sought priority in bankruptcy pursuant to 31 U.S.C. § 191.[3] *Id.* at 201–202, 59 S.Ct. 811. The United States Supreme Court held that the government was not entitled to priority. *Id.* at 207–08, 59 S.Ct. 811. The Court held: "We are of the view that [the priority statute] is inapplicable to general claims in bankruptcy transferred to the United States, or to which it has become subrogated on payment, after the filing of the petition for the reason that the rights of creditors are fixed by the Bankruptcy Act as of the filing of the petition in bankruptcy." *Id.* at 207, 59 S.Ct. 811. Thus, the Court held that the debt was not

a claim of the United States for priority purposes until the United States paid its insurance obligation—mere insurance by the government of a private loan did not give rise to a claim under the priority statute.

Similarly, in *Brocato,* the Gateway National Bank made a loan to the debtor. *Brocato,* 403 F.2d at 107. The Small Business Association ("SBA") acted as a guaranty—(1) the bank could require the SBA to purchase 85% of the indebtedness if the borrower was in default for 90 days; or (2) the commencement of bankruptcy effectuated an automatic, simultaneous assignment to the SBA, and the obligation of the SBA to pay the bank 85% of the indebtedness would arise. *Id.* The debtor filed bankruptcy on December 29, 1964—the note was formally assigned to the SBA on January 4, 1965. *Id.* at 108. The SBA filed a claim in bankruptcy, alleging priority status. *Id.* The Fifth Circuit noted that the United States must have "either actual legal title to the debt, or 'beneficial ownership' of the debt prior to the filing of a bankruptcy petition." *Id.* The Court distinguished *McClellan,* where the SBA actually supplied three-fourths of the money loaned. *Id.* at 109. Thus, because the SBA did not have legal title to the note or beneficial ownership prior to the filing of bankruptcy, the United States was not entitled to priority. *Id.* at 109, 110.

Consequently, contrary to Plaintiffs' contention, the Court concludes that the construction of the term "claim" in the priority statute –31 U.S.C. § 3713—is consistent with that previously determined by this Court.[4]

---

3. Section 191 was the predecessor to section 3713. *Cerilli,* 624 A.2d at 838 n. 2. The language of the statutes is substantially similar to one another, thus, cases interpreting section 191 are helpful in interpreting section 3713. *Id.*

4. To the extent that *United States v. Excellair, Inc.,* 637 F.Supp. 1377, 1394–95 (D.Colo. 1986), holds otherwise, the Court respectfully declines to follow *Excellair.* Section 3701(b)(1)(A) merely clarifies that debts owed to the United States includes funds owed to

### 2. "Claims ... Outstanding" under the Statute

■ Plaintiffs also dispute the Court's previous reliance on Treasury Regulation 31 C.F.R. § 901.3(a)(4)—which defines the term "outstanding.".[5] The regulation states:

Unless otherwise provided by law, administrative offset of payments under the authority of 31 U.S.C. § 3716 to collect a debt may not be conducted more than 10 years after the *Government's right to collect the debt first accrued,* unless facts material to the Government's right were not known and could not reasonably have been known by the official or officials of the Government who were charged with the responsibility to discover and collect such debts. This limitation does not apply to debts reduced to a judgment.

C.F.R. § 901.3(a)(4) (emphasis added). Plaintiffs argue that this regulation, which interprets the term "outstanding", is unreasonable because Congress understood outstanding debts to refer to debts that were not in a delinquent status. Instead, Plaintiffs argue that a claim is outstanding for purposes of the statute of limitation as soon as the loan is distributed to the student. The Court, once again, disagrees.

Because the Court holds that the government may not administratively offset a federal payment until a debt is owed to the United States, common sense dictates that the statute of limitations should not begin to run until that time. If Plaintiffs' interpretation is accepted by the Court, the statute of limitations may expire before a student has defaulted on a loan, or in a rare instance, before a student is even required to begin repayment of his or her student loan. Repayment of a student loan does not begin until one's academic career is completed. Furthermore, repayment of student loans may be deferred for numerous reasons (e.g., economic hardship, enrollment in a graduate fellowship program, continuing enrollment in an eligible school on a half-time basis, etc.). Thus, if a student received a Federal Stafford Loan during her freshman year, took 4 years to graduate, and received a thirty-six month deferral for economic hardship, repayment of her first year Stafford Loan would not begin until approximately eight years had elapsed on the statute of limitations. As noted in the Court's March 28, 2002 Order and *infra,* such a result appears to be at odds with the language of the offset provision and Congress' intent in providing for administrative offsets.

---

the Untied States on account of loans directly made by the United States Government, as well as funds owed to the United States government on account of loans insured by the government and loans guaranteed by the government. *Excellair* is the only published decision which has extended the definition of the term "claim" to private debts held by third parties that are merely guaranteed by the government. *Cf. United States v. Schlesinger,* 88 F.Supp.2d 431, 459 (D.Md.2000) and *United States v. Blumenfeld,* 128 B.R. 918, 928–29 (E.D.Pa.1991).

**5.** When promulgating the regulation, the General Accounting Office and the Department of Justice stated:

The Debt Collection Act of 1982 applies the limitation to claims that have been "outstanding" for more than 10 years. Since the term "outstanding" has no clearly established meaning in this context, we phrased the limitation in the proposed regulation in terms of when the debt "first accrued." Two commenters suggested that we be more specific as to when a debt first accrues. There is a body of case law on the concept of accrual (for example, under 28 U.S.C. § 2415), and it is not feasible to carry all of this detail into the regulation. We have, however, added a clause to [the regulation] incorporating this case law by reference.
49 Fed.Reg. 8889, 8891 (Mar. 9, 1984).

■ The Treasury regulation in this case is a permissible construction of the statute. If a statute is silent or ambiguous with respect to a specific issue, a court must determine if the agency regulation is a permissible construction of the statute. *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291–92, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988); *Mid–America Care Foundation v. NLRB,* 148 F.3d 638, 642 (6th Cir.1998). Statutory language contained in section 3716 supports the Department of Treasury's conclusion that the statute of limitation begins to run when the government's right to collect the debt first accrues. Section 3716(a) provides that an administrative offset may only be utilized after the debtor has been provided with written notice of the claim, is given an opportunity to examine the government records and have a review of the agency decision, and is afforded an opportunity to enter into a repayment plan. As noted by the government, this language supports the agency's conclusion that the administrative offset provision applies to debts in default. The conclusion is buttressed by section 3716(c)(7). This subsection provides that after an administrative offset has occurred, the government must provide notice of the occurrence of an offset to satisfy the "past due legally enforceable debt." [6] Thus, the agency interpretation is a permissible construction of the statute.[7]

The agency's interpretation is also supported by the legislative history of 28 U.S.C. § 2415. As noted by the Government, sections 3716 and 2415 were amended at the same time. 28 U.S.C. § 2415(a) provides that actions for money damages based in contract "shall be barred unless the complaint is filed within six years after the right of action accrues." Section 2415(i), however, provides: "The provisions of this section shall not prevent the United States or an officer or agency thereof from collecting any claim of the United States by means of administrative offset, in accordance with section 3716 of title 31." According to the Senate Report discussing the Debt Collection Act:

Section 9 allows collection of *delinquent debts owed the government* by administrative offset beyond the six-year statute of limitations. Many overdue debts owed the government are now or will be six years old before offset becomes possible. The Justice Department has determined that the six-year statute of limitations prevents the government from collecting debts over six years old by means of offset, thus, the government will be unable to collect a just debt for many debtors because the statute of limitations has run out. For example, the Civil Service Code, 5 U.S.C. § 5514, allows federal agencies to set off a federal employee's retirement pay in cases where he has not paid a federal claim. However, if more than six years passes between the *default* and retirement, the government will be unable to set off the employee's retirement pay. This revision to section 2415 would allow adminis-

---

6. Contrary to Plaintiffs' assertion, section 3716(c)(6) does not counsel otherwise. The decision to submit a claim for administrative offset under section 3716(a) is discretionary. Section 3716(c)(6) merely mandates that any agency that is owed a past due legally enforceable debt that is "over 180 days [6 months] delinquent" must submit the claim for administrative offset under section 3716.

7. The fact that the term "outstanding debt," as utilized in other sections of the Debt Collection Act, see 31 U.S.C. § 3720B(a) and 31 U.S.C. § 3711(i)(4), may also support alternative interpretations, does render the agency's interpretation of the statute of limitations contained in section 3716(e)(1) unreasonable. The apparent inconsistent use of the term "outstanding debt" or "debt outstanding" simply reinforces the Court's conclusion that the statutory language is ambiguous.

trative offset of *delinquent debts owed the government* against future payments benefits, or nontax refunds due the *delinquent debtor* beyond the six-year statute of limitations.

S. REP. No. 97–378, at 16–17 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3377, 3392–93 (emphasis added). Thus, this legislative history indicates (1) that the administrative offset provision applied to delinquent debt and (2) Congress sought to extend the government's ability to administratively offset federal payments that might not arise until after the six-year statute of limitations contained in section 2415 had expired—i.e., governmental retirement benefits or tax refunds. This history strongly supports the agency's interpretation.[8] Consequently, the Court reaffirms its prior holding that the limitations period begins to run when the government's right to collect the debt first accrues.

### 3. Conclusion

 The Court, therefore, reaffirms its prior conclusion. (See Appendix A—Part C.1). The 10–year statute of limitations begins to run when the government's right to collect the debt first accrues. As such, Plaintiffs' motion for summary judgment is DENIED with respect to Plaintiff Guillermety. The Treasury offset of Plaintiff Guillermety's Social Security benefits in 1991 was not more than 10 years from the date the government's right to collect the debt first accrued.

Consistent with this conclusion, the Court, *sua sponte*, grants summary judgment in favor of Defendants with respect to Plaintiff Guillermety's claims. According to the Sixth Circuit, "although 'a district court should only enter summary judgment in the absence of a cross-motion with great caution ... the fact that the nonmoving party has not filed its own summary judgment motion does not preclude the entry of summary judgment if otherwise appropriate.'" *Shelby County Health Care Corp. v. Southern Council of Indus. Workers Health and Welfare Trust*, 203 F.3d 926, 932 (6th Cir.2000) (citing *In re Century Offshore Mgmt. Corp.*, 119 F.3d 409, 412 (6th Cir.1997)); *see also Markva v. Haveman*, 168 F.Supp.2d 695, 706–07 (E.D.Mich.2001) ("Thus, when a party has moved for summary judgment, and the Court agrees that there is no genuine dispute of material fact, but believes that judgment as a matter of law is appropriate for the non-moving party, the Court is free to so declare."). For example, in *In re Century Offshore Mgmt. Corp*, *supra*, the Sixth Circuit held that a *sua sponte* grant of summary judgment to the non-moving party was proper where the parties had fully briefed the determinative issue and the parties conceded that there were no facts at issue. *Id.* at 412. Similarly, here, the material facts are not con-

---

**8.** As noted by Plaintiffs, the circuit court's are split with respect to when an action "accrues" under section 2415(a). The Fifth Circuit has held that the cause of action accrues when it originally comes into existence. *FDIC v. Belli*, 981 F.2d 838, 840 (5th Cir. 1993); *see also United States v. Agri Services, Inc.*, 81 F.3d 1002, 1006 n. 2 (10th Cir.1996) (citing *Belli*). However, the Third and Ninth Circuits have reached the opposite conclusion—the claim accrues when it is assigned to the government. *FDIC v. Hinkson*, 848 F.2d 432, 434–35 (3d Cir.1988); *FDIC v. Former*

*Officers & Directors of Metropolitan Bank*, 884 F.2d 1304, 1307 (9th Cir.1989). It is interesting to note, however, that even if *Belli* is applied in this case, Plaintiff Guillermety's claims would not be barred by the 10–year statute of limitations. *Belli* simply held that assignment of a cause of action does not normally recommence the limitations period. *Belli*, 981 F.2d at 840. The original cause of action in this case—the default on the student loan—did not occur until 1992 and 1993, well within the 10–year statute of limitations period.

tested by the parties. Furthermore, the dispute in this case solely involves a legal issue, an issue which has been extensively briefed by the parties as part of the motion for preliminary injunction and the current motion for summary judgment. Consequently, the Court concludes, based on the analysis *supra*, that summary judgment must be granted in favor of Defendants with respect to Plaintiff Guillermety's claims.

**D. 20 U.S.C. § 1091a Does Not Eliminate the Statute of Limitations Contained in 31 U.S.C. § 3716(e)(1) With Respect to the Administrative Offset of Social Security Benefits to Collect Outstanding and Delinquent Student Loans**

Plaintiff Edgmon's Federal Perkins Loan was assigned to the Department of Education on February 1, 1990. As such, the Treasury's offset of Edgmon's Social Security benefits in September, 2001 was clearly more than 10 years from the date the loan became a claim of the United States.

 The Government's response to Plaintiffs' motion for summary judgment sets forth the same arguments as that made when opposing Plaintiffs' motion for preliminary injunction. The Government argues that Plaintiffs' claim must fail because the 1996 amendment to section 3716 did not implicitly repeal the 1991 amendment to 20 U.S.C. § 1091a. The Court reaffirms its analysis and the legal conclusion reached in Part C.2 of the March 28, 2002 Order granting in part and denying in part Plaintiffs' motion for preliminary injunction. (See Appendix A—pages 18–31.) The Court holds that the government may not offset a recipient's Social Security benefits in order to collect student loans that have been outstanding for more than ten years from the date the government's right to collect the debt first accrued. Plaintiff Edgmon's motion for summary judgment is therefore GRANTED. The Secretary of Treasury is hereby PERMANENTLY ENJOINED, pursuant to 31 U.S.C. § 3716(e)(1), from offsetting Plaintiff Edgmon's Social Security benefits to collect his outstanding and delinquent Federal Perkins Loan.

### CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for summary judgment. Specifically, the Court GRANTS Plaintiffs' motion with respect to Plaintiff Edgmon, and DENIES Plaintiffs' motion with respect to Plaintiff Guillermety. Furthermore, the Court, *sua sponte*, GRANTS summary judgment in favor of Defendants with respect to Plaintiff Guillermety's claims. Accordingly, IT IS ORDERED that the Secretary of Treasury of the United States is hereby PERMANENTLY RESTRAINED and ENJOINED from offsetting Plaintiff Edgmon's Social Security benefits to collect his outstanding and delinquent Federal Perkins Loan.

SO ORDERED.

### APPENDIX A

March 28, 2002.

### ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

This is a case concerning the administrative offset of Plaintiffs' Social Security benefits by the Secretary of Treasury, pursuant to 31 U.S.C. § 3716, to collect outstanding student loan balances owed to the United States. Now before the Court is Plaintiffs' motion for preliminary injunction. The motion presents an issue of first impression—the Court must decide whether the Secretary of Treasury may offset a

recipient's Social Security benefits in order to collect student loans owed to the Untied States which allegedly have been outstanding for more than ten years. In doing so, the Court must reconcile an apparent conflict between three statutes: (1) 42 U.S.C. § 407; (2) 31 U.S.C. § 3716; and (3) 20 U.S.C. § 1091a.

The Court heard oral argument on March 14, 2002. Having considered the entire record, and for the reasons that follow, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for preliminary injunction. Specifically, the Court GRANTS Plaintiffs' motion with respect to Plaintiff Edgmon, and DENIES Plaintiffs' motion with respect to Plaintiffs Guillermety and Botta. Accordingly, IT IS ORDERED that, until further Order of the Court, the Secretary of Treasury of the United States is hereby RESTRAINED and ENJOINED from undertaking any administrative offset of Plaintiff Glenn D. Edgmon's Social Security benefits to collect his outstanding Federal Perkins Loan. The Court notes that this ruling does not prevent the United States from suing Plaintiff Edgmon for his debt, and if successful, securing a judgment against him for the sums at issue.

## BACKGROUND

### A. The Plaintiffs

Plaintiffs Livia Guillermety ("Guillermety"), Glenn Edgmon ("Edgmon") and Fiore Botta ("Botta") currently receive Social Security retirement benefits from the United States government.

Plaintiff Guillermety is sixty-five years old.[1] (Compl. ¶ 4.) She lives on a fixed income-relying primarily upon Social Security benefits of approximately $1,117 per month ($13,400 per year). (*Id.*) These funds are used for Guillermety's basic necessities, including food, rent, utilities, and transportation, as well as for uninsured medical and dental expenses. (Pl.'s Prelim. Inj. Mot. at 6.) Guillermety also earns approximately $200 per week ($10,400 before taxes annually) as a housekeeper. (Guillermety affidavit ¶ 2.)

Plaintiff Edgmon is sixty-five years old, and is currently confined to a wheelchair.[2] (Compl. ¶ 5; Pl.'s Prelim. Inj. Mot. at 4.) His sole source of income is Social Security retirement benefits of approximately $849 per month (approximately $10,200 per year). (*Id.*) Edgmon uses this money for basic necessities—food, utilities, rent, insurance, clothing, and uninsured medical expenses. (Edgmon Affidavit at ¶ 6.) Because he is confined to a wheelchair, Mr. Edgmon often relies on the Internet to obtain food and groceries. (Pl.'s Prelim. Inj. Mot. at 4.)

Plaintiff Botta is seventy-seven years old.[3] His primary source of income is monthly Social Security retirement benefits of $991 (approximately $12,000 per year). (Compl. ¶ 6.) He also receives income from two small pensions totaling $173 per month (approximately $2,100 annually). (Pl.'s Prelim. Inj. Mot. at 5.) Botta has survived several serious medical conditions, including stomach cancer, cataract surgery, and heart surgery. (Botta Affidavit at ¶ 4.) Like Guillermety and Edgmon, Botta relies upon his Social Security retirement benefits to meet his most basic needs. (*Id.* ¶ 5.) In fact, Botta's fixed

1. Guillermety is a citizen of the state of Michigan.

2. Edgmon is a citizen of the state of Oklahoma.

3. Botta is a citizen of the state of Connecticut.

expenses for basic necessities—rent (shared apartment), utilities, gas, insurance and groceries—total approximately $975 per month. (*Id.* ¶ 6.) This figure does not include the cost of Botta's uninsured prescription medication—$300 every ninety-days. (*Id.* ¶ 7.) Botta has been forced to stagger payments in order to pay his bills. (*Id.* ¶ 5.)

## B. Plaintiffs' Student Loans and the Government's Administrative Offset

Beginning in late 2001, the Department of Treasury, at the request of the Department of Education, began to offset a portion of Plaintiffs' monthly Social Security retirement benefits, pursuant to the Debt Collection Improvement Act—31 U.S.C. § 3716, in order to collect amounts due the United States. Specifically, monies were administratively offset in order to collect outstanding and delinquent student loans assigned to the Department of Education.[4]

### 1. Plaintiff Guillermety

Plaintiff Guillermety's outstanding student loans allegedly arose from her studies at the University of Detroit–Mercy and St. Mary's College in the state of Michigan. (Compl.¶ 14.) According to the Govern-

ment, from 1985 to 1991, Guillermety took out two Federal "Perkins"[5] loans and three Federal "Stafford"[6] loans.[7] (Def.'s Resp. Br. at 6–9.)

Guillermety allegedly defaulted on the two Perkins loans in June and September, 1992. (*Id.*) The Perkins loans were assigned by the University of Detroit–Mercy to the Department of Education on November 12, 1997. (*Id.*)

Guillermety allegedly defaulted on the three Stafford loans in April 1992, August 1992, and August 1993. (*Id.*) The Department of Education paid its reinsurance obligation in May 1993, September 1992, and September 1993, respectively. (*Id.*) The Stafford loans were assigned to the Department of Education in 1996. (*Id.*) Guillermety's outstanding student loan balance, including accrued interest, now totals nearly $18,000. (*Id.*)

In September, 2001, the Secretary of Treasury, upon certification from the Department of Education, began withholding $167.55 from Guillermety's monthly Social Security payment, imposing an administrative offset pursuant to the Debt Collection Improvement Act in order to collect Plaintiff's outstanding student loans. (Compl. ¶ 13; Def.'s Answer ¶ 13.) This amount

---

4. The repayment information contained *infra* concerning Plaintiffs' outstanding student loans was derived from the Defendants' Response Brief and Answer to Plaintiffs' Complaint. Although the specific dates listed below are based on preliminary information, no conflicting testimony or evidence has been presented to the Court, at this time, regarding the accuracy of the information. As such, the Court will rely on the dates represented by the Government when evaluating Plaintiffs' motion for preliminary injunction, as this represents the only information available as to when Plaintiffs defaulted on their loans, when the Department of Education paid its reinsurance obligation, and when the loans were actually assigned to the Department of Education.

5. "Perkins" loans are explained *infra* at Page 17 et seq.

6. "Stafford" loans are explained *infra* at Page 15 et seq.

7. According to the Defendants' Counterclaim, Guillermety actually received six payments. She received Federal Stafford Loans of $2,500 on September 20, 1985 and October 17, 1988. She also received a $4,000 Federal Stafford Loan on May 21, 1990. Guillermety also received three Perkins Loan payments: $750 on October 31, 1988, $468 on December 3, 1990, and $467 on January 7, 1991. (Def.'s Counterclaim ¶ 9.)

represents 15% of her monthly Social Security payment,[8] reducing her annual Social Security benefit to approximately $11,400.

### 2. Plaintiff Edgmon

Plaintiff Edgmon's outstanding student loan allegedly arose from his studies at Northeastern State University in the state of Oklahoma. (Compl.¶ 16.) Edgmon took out one Perkins loan in 1977, allegedly defaulting on the loan in November, 1978. (Def.'s Resp. Br. at 9–10.) The loan was assigned by Northeastern State University to the Department of Education in March, 1990. (Id.) The outstanding loan balance, including accrued interest and fees, now totals approximately $4,150.[9] (Id.)

Beginning in September, 2001, the Department of Treasury, upon certification from the Department of Education, began withholding $77 from Edgmon's Social Security payment, imposing an administrative offset pursuant to the Debt Collection Improvement Act in order to collect Plaintiff's outstanding student loan.[10] (Compl.¶ 15.) The current offset represents 12% of his monthly Social Security benefit, reducing his annual income to $9,000.[11]

### 3. Plaintiff Botta

Plaintiff Botta's outstanding student loan did not arise from his own edu-cation—instead, Botta allegedly took out a Parent Loan for Undergraduate Students (PLUS loan) in September, 1990. (Compl.¶ 18.) Botta allegedly defaulted on this loan in July, 1992. (Def.'s Resp. Br. at 10–12.) Although it is unclear when the Department of Education paid its reinsurance obligation, it could not have done so prior to April 30, 1993, the date on which the guaranty agency paid the private lender's claim. (Id.) The loan was officially assigned to the Department of Education on December 3, 1993. (Id.) The outstanding loan balance, including accrued interest, now totals approximately $7,675. (Id.)

Beginning in October, 2001, the Department of Treasury, upon certification from the Department of Education, began withholding $147.80 from Botta's Social Security payment, imposing an administrative offset pursuant to the Debt Collection Improvement Act in order to collect Plaintiff's outstanding PLUS loan.[12] (Compl.¶ 17.) This amount represents 15% of his monthly Social Security benefit, reducing his annual income to approximately $10,100.

### C. The Underlying Dispute

After the Government's administrative offsets began, each Plaintiff, through counsel, sent a letter to the Department of Education, arguing that the offset of their Social Security benefit was unlawful because their student loan balance had been

---

8. This amount was calculated pursuant to Treasury regulations. *See* 31 C.F.R. § 285.4(e).

9. Edgmon applied for a total and permanent disability discharge on March 12, 2001. His request was denied on September 20, 2001. (Def.'s Resp. Br. at 9–10.) According to the Defendants, Edgmon's discharge application was denied due to the failure of the medical professional to fully complete the required forms. (Def.'s Amended Resp. Br. at 10.)

10. The offset apparently increased to $99 on February 1, 2002. (Def.'s Answer ¶ 15.)

11. The 2001 poverty guideline set by the Department of Health and Human Services lists $8,590 as the relevant poverty line. 66 Fed. Reg. 10695–01, 2001 WL 127217 (2001).

12. According to the Defendants' Answer, the offset was $148.80. (Def.'s Answer ¶ 17.)

outstanding for more than 10 years. (Compl.) The letters cited 42 U.S.C. § 407, which precluded the offset of Social Security benefits absent express congressional abrogation.[13] Plaintiffs acknowledged, moreover, that 31 U.S.C. § 3716(c)(3)(A)(i) permitted the administrative offset of Social Security benefits.[14] However, the letter argued that section 3716 specifically prohibited the administrative offset of claims outstanding for more than ten years: "This section does not apply (1) to a claim under this subchapter that has been outstanding for more than 10 years." 31 U.S.C. § 3716(e)(1). Thus, according to the Plaintiffs, the administrative offsets were inappropriate because their loans were allegedly outstanding for more than ten years.

The Department of Education disagreed, arguing that the ten-year statute of limitation did not apply to the collection of educational loans. (Compl.) As authority for this proposition, the Department cited 20 U.S.C. § 1091a(a)(2), which had previously eliminated all statutes of limitation with respect to the collection of student loans. As a result, the Department of Education continued to offset Plaintiffs' social security benefits in order to collect the aforementioned outstanding student loans.

Plaintiffs filed suit with this Court on December 20, 2001, seeking a declaratory judgment that these offsets were unlawful. Plaintiffs' lawsuit also sought restoration of all benefits offset, injunctive relief, and attorney's fees and costs. Plaintiffs now seek a preliminary injunction preventing the seizure of their Social Security benefits pending a final resolution of their lawsuit.

## ANALYSIS

### A. The Secretary of Treasury is a Proper Party to the Lawsuit

The Government, as an initial matter, argues that the Secretary of Treasury ("Treasury") is not a proper party to Plaintiffs' lawsuit. The Treasury disburses federal payments, for example Social Security benefits, to recipients on behalf of various federal agencies, for example, the Social Security Administration. (Def.'s Resp. Br. at 12.) The Treasury also operates a debt collection program known as the Treasury Offset Program ("TOP"). (*Id.*) Creditor agencies, in this case the Department of Education, submit government claims to the Treasury for collection by offset under the TOP—here 31 U.S.C. § 3716. (*Id.*) The Government contends that the Treasury exercises no control over the collection of the debt—he simply offsets a federal payment upon certification from the creditor agency that the debt is valid and legally enforceable. (*Id.* at 13.) Thus, according to the Government, an injunction against the Treasury is improp-

---

**13.** Section 407 states, in relevant part:
(a) The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.
(b) No other provision of law, enacted before, on, or after April 20, 1983, may be construed to limit, supercede, or otherwise modify the provisions of this section except to the extent that it does so by express reference to this section.
42 U.S.C. §§ 407(a)-(b).

**14.** Specifically, section 3716(c) states: "Notwithstanding any other provision of law (including ... 42 U.S.C. 407 ...), except as provided in clause (ii), all payments due to an individual under (I) the Social Security Act ... shall be subject to offset under this section." 31 U.S.C. § 3716(c)(3)(A)(i).

er because he has no authority over the debt without certification from the creditor agency—the "debt collection is triggered and controlled by [the Department of] Education." [15] (*Id.* at 14.)

The Court disagrees. Although the Treasury cannot initiate an offset without certification from the Department of Education, it is the Treasury that is charged with disbursing federal payments, and it is the Treasury that is charged with actually offsetting the recipients federal payment on behalf of the creditor agency. Moreover, the Treasury has been given substantial rule-making authority under the Debt Collection Improvement Act. 31 U.S.C. § 3716(c)(5) declares:

> The Secretary of the Treasury in consultation with the Commissioner of Social Security and the Director of the Office of Management and Budget, may prescribe such rules, regulations, and procedures as the Secretary of the Treasury considers necessary to carry out this subsection. The Secretary shall consult with the heads of affected agencies in the development of such rules, regulations, and procedures.

31 U.S.C. § 3716(c)(5); *see, e.g.,* 31 C.F.R. §§ 5.30–38, 285.1–8, 901.1–12 (establishing detailed regulations concerning the administrative offset of federal payments).

It is irrelevant whether offsets would not occur without certification from the Department of Education—the Treasury is the party who regulates the administrative offset of federal payments, and the Treasury is the party actually offsetting the recipient's benefits, and, as such, he is a proper party to this lawsuit. Moreover, contrary to the Government's contention, an injunction would not force "a Federal agency or official to perform a function it is not clearly authorized by law to perform." Instead, an injunction would require the Treasury to cease performing a function that he clearly is authorized to perform—the offset, in certain circumstances, of Social Security benefits pursuant to 31 U.S.C. § 3716.[16] As such, the

---

**15.** As noted by the Government, the Higher Education Act only provides a limited waiver of sovereign immunity, generally prohibiting the issuance of an injunction against the Secretary of the Education. 20 U.S.C. § 1082(a)(2) provides that the Secretary may:

> (2) sue and be sued ... in any district court of the United States, and such district courts shall have jurisdiction of civil actions arising under this part without regard to the amount in controversy, and action instituted under this subsection by or against the Secretary shall survive notwithstanding any change in the person occupying the office of Secretary or any vacancy in that office; but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Secretary or property under the Secretary's control ...

28 U.S.C. § 1082(a)(2). Thus, according to Defendants, a preliminary injunction is improper in this case because the Secretary of Treasury is not a proper party, and the Secretary of Education may not be enjoined pursuant to 20 U.S.C. § 1082(a)(2). Courts have held that an injunction is permitted where the Secretary of Education has exercised powers that are clearly outside the scope of his statutory authority. *See Calise Beauty School, Inc. v. Riley,* 941 F.Supp. 425 (S.D.N.Y.1996); *Canterbury Career Sch., Inc. v. Riley,* 833 F.Supp. 1097 (D.N.J.1993). Because the Court concludes that the Secretary of Treasury is a proper party, the Court need not address this issue.

**16.** The Court is unaware of, and the government has not cited to, statutory authority similar to that governing the offset of federal tax refunds. 26 U.S.C. § 6402(f) declares:

> Review of reductions.—No court of the United States shall have jurisdiction to hear any action, whether legal or equitable, brought to restrain or review a reduction authorized by subsection (c), (d), or (e).... This subsection does not preclude any legal, equitable, or administrative action against the Federal agency or State to which the amount of such reduction was paid or any

Court will proceed to the merits of Plaintiffs' motion.

## B. Preliminary Injunction Standard

The granting of a preliminary injunction is committed to the sound discretion of the trial court. *United States v. Any And All Radio Station Transmission Equip.*, 204 F.3d 658, 665 (6th Cir.2000). The plaintiff has the burden of proof in seeking an injunction. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 441, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974); *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256 (6th Cir.1968).

The Sixth Circuit has held that a court must consider four factors when deciding whether to issue a preliminary injunction: (1) whether the plaintiff has a strong likelihood of succeeding on the merits; (2) whether the plaintiff will suffer irreparable injury absent the injunction; (3) whether issuing the injunction will cause substantial harm to others; and (4) whether the public interest will be furthered by the issuance of the injunction. *Gonzales v. National Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir.2000). These considerations are merely factors to be balanced, "not prerequisites that must be met." *Teamsters Local Union 299 v. U.S. Truck Co. Holdings*, 87 F.Supp.2d 726, 733 n. 2 (E.D.Mich.2000) (quoting *Mascio v. Public Employees Ret. Sys. of Ohio*, 160 F.3d 310 (6th Cir.1998)). However, a finding that there is no likelihood of success on the merits is usually fatal. *Gonzales*, 225 F.3d at 625.

## C. Strong Likelihood of Success on the Merits

### 1. Claims Outstanding for More than 10 Years

As a threshold matter, the Government argues that Plaintiff Guillermety's and Plaintiff Botta's claims have not been outstanding for more than ten years. Consequently, the Government contends that the limitation found in section 3716(e)(1), prohibiting the offset of claims outstanding for more than ten years, has not been violated, even assuming that the limitation is applicable, in this case, to the offset of Plaintiffs' Social Security benefits. Based on the record currently before the Court, the Court agrees.

"It is a well settled canon of statutory construction that when interpreting statutes, '[t]he language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear.'" *United States v. Boucha*, 236 F.3d 768, 774 (6th Cir.2001) (quoting *United States v. Choice*, 201 F.3d 837, 840 (6th Cir.2000)). The clear and unambiguous language of section 3716 speaks to the collection of "claims" of the United States Government. Section 3716(a) states, in relevant part: "After trying to collect a *claim* from a person under section 3711(a) of this title, the head of the executive . . . agency may collect the *claim* by administrative offset." 31 U.S.C. § 3716(a) (emphasis added). Subsection (e) of the provision provides a statute of limitation, declaring: "This section does not apply (1) to a *claim* under this subchapter that has been outstanding for

such action against the Commissioner of Social Security which is otherwise available with respect to recoveries of overpayments of benefits under section 204 of the Social Security Act.

26 U.S.C. § 6402(f); *see also Setlech v. United States*, 816 F.Supp. 161, 166 (E.D.N.Y. 1993).

more than 10 years." 31 U.S.C. § 3716(e)(1) (emphasis added).

A "claim" is defined under this subchapter as: "any amount of funds or property that has been determined by an appropriate official of the Federal Government *to be owed to the United States* by a person, organization, or entity other than another Federal agency."[17] 31 U.S.C. § 3701(b)(1) (emphasis added). Furthermore, the Treasury regulation which sets forth the special rules applicable to the offset of Federal benefit payments, including Social Security benefits, defines "claim" in an identical manner: "claim" means "an amount of money, funds, or property which has been determined by an agency official to be due the United States from any person, organization, or entity except another Federal agency." 31 C.F.R. § 285.4(b).

The Debt Collection Improvement Act, therefore, only speaks to the offset of amounts owed to the United States Government, or, third-party claims which the United States has a legal right to collect.[18] An alternative reading simply cannot be reconciled with the unambiguous language of the statute. Moreover, the limitation period set forth in section 3716(e) speaks to "claims" under this subchapter—i.e., claims of the United States. The limitation period contained in 31 U.S.C. § 3716(e)(1), therefore, only begins to run

when the debt, the student loan in this case, becomes a claim of the United States—it does not begin to run when the student loan becomes delinquent in the hands of an outside lender. This interpretation is consistent with Treasury regulations setting forth the federal claims collection standards. 31 C.F.R. § 901.3(a)(4) states:

> Unless otherwise provided by law, administrative offset of payments under the authority of 31 U.S.C. § 3716 to collect a debt *may not be conducted more than 10 years after the Government's right to collect the debt first accrued,* unless facts material to the Government's right were not known an could not reasonably have been known by the official or officials of the Government who were charged with the responsibility to discover and collect such debts. This limitation does not apply to debts reduced to a judgment.

31 C.F.R. § 901.3(a)(4) (emphasis added). This reasonable, formal interpretation of the statute, is accorded substantial deference. *See Mid–America Care Foundation v. NLRB,* 148 F.3d 638, 642 (6th Cir.1998) (discussing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

The Plaintiffs disagree. At oral argument, Plaintiffs referenced the Fifth Circuit Court of Appeals decision, *Grider v. Cavazos,* 911 F.2d 1158 (5th Cir.1990).[19]

---

17. *See also* 31 C.F.R. § 5.30 ("These regulations apply to the collection of debts owed to the United States ..."). A claim specifically includes amounts, like those in this case, owed to the United States for "funds owed on account of loans made, insured, or guaranteed by the Government ..." 31 U.S.C. § 3701(b)(1)(A).

18. *See* 31 U.S.C. § 3701(b)(1)(D) ("A claim includes, without limitation—(D) any amount the United States is authorized by statute to collect for the benefit of any person."). Ap-

parently, the Government is also permitted to offset amounts owed to a State, the District of Columbia, American Samoa, Guam, the United States Virgin Islands, the Commonwealth of Northern Mariana Islands, or the Commonwealth of Puerto Rico. 31 U.S.C. § 3701(b)(2).

19. *Cf. Jones v. Cavazos,* 889 F.2d 1043 (11th Cir.1989); *Roberts v. Bennett,* 709 F.Supp. 222 (N.D.Ga.1989).

There, the Fifth Circuit interpreted 31 U.S.C. § 3720A, and the relevant regulation, 26 C.F.R. § 301.6402–6(T)(b)(2), to impose a ten year statute of limitation, beginning from the time the debt first became delinquent, not from the time the loan was assigned to the government. *Id.* at 1164. However, even assuming *arguendo*, that this interpretation is correct and applies with equal force to the offset of student loans pursuant to 31 U.S.C. § 3716,[20] the Court's conclusion *infra* would not change. Plaintiff Guillermety and Plaintiff Botta defaulted on their loans in 1992 and 1993, less than ten years before the Government initiated offset of their Social Security benefits in late 1991.

Seemingly recognizing this problem, counsel for Plaintiffs took the argument one step further at oral argument—Plaintiffs argue that the statute of limitation under section 3716(e)(1) began to run when the underlying student loan was incurred by Plaintiffs, in this case when each Plaintiff received the money and/or when the money was credited to the Plaintiff's tuition account. This reading simply cannot be reconciled with the statutory language of the Debt Collection Improvement Act, and the Treasury regulation setting forth the federal claims collection standards, discussed *supra*. The Court cannot accept the conclusion, given the clear language utilized by Congress, that the statute of limitation begins to run on the Government's ability to administratively offset a non-tax claim before the Government has a right of action with respect to the debt.

Consequently, the Court must determine when the Plaintiffs' outstanding student loan debt became a "claim" of the United States. To do so, the Court must differentiate between the different loans received by the Plaintiffs in this case.

### (i) Federal Stafford and PLUS Loans

Federal Stafford Loans (both subsidized and unsubsidized) and Federal PLUS Loans are available through the federally sponsored Federal Family Education Loan Program ("FFELP").[21] Under the FFELP, student loans are originated by

---

**20.** This interpretation is tenuous at best. *Grider* was based on the Fifth Circuit's interpretation of what the court found to be the regulation's unambiguous language. Unlike section 3716(e)(1) which states that the section does not apply to "claims" outstanding for more than 10 years, 26 C.F.R. § 301.6402–6(T)(b)(2), the tax refund offset regulation in force at the time the government offset the recipient's federal tax refund pursuant to 31 U.S.C. § 3720A, stated: "For the purposes of this section, a past-due legally enforceable debt which may be referred by a Federal agency to the Service for offset is a debt—(2) Which, ..., has been delinquent for at least three months but has *not been delinquent for more than ten years* at the time the offset was made." 26 C.F.R. § 301.6402–6(T)(b)(2) (emphasis added). Thus, contrary to the language and definitions currently utilized in section 3716, the prior regulation, which related solely to the offset of federal tax refunds, explicitly defined the statute of limitation in terms of debts that had not been "delinquent" for more than 10 years. Moreover, the language of the current tax refund offset regulation, like the current language of the non-tax administrative offset regulation discussed *supra*, supports the conclusion that the statute of limitation for tax refund offsets, like non-tax offsets, now begins when the government's right of action accrues. 31 C.F.R. 285.2(d)(1)(ii), effective January 1, 1998, states that the federal agency must certify that: "Except in the case of a judgment debt or as otherwise allowed by law, the debt is referred for [tax refund] offset within ten years after the agency's right of action accrues." 31 C.F.R. 285.2(d)(1)(ii).

**21.** Federal Stafford and PLUS Loans available under the FFELP should be distinguished from Direct Stafford and PLUS Loans available under the federally sponsored Federal Direct Student Loan Program, established in 1993. See 20 U.S.C. §§ 1087a—1087j. Under the Direct Student Loan Program, the United States Government makes

private lending institutions, such as banks and credit unions. Cara A. Morea, Note, *Student Loan Discharge in Bankruptcy— It is Time for a Unified Equitable Approach*, 7 AM. BANKR. INST. L. REV. 193, 206 & n. 89 (1999) (citing JONATHAN SHELDON, UNFAIR AND DECEPTIVE ACTS AND PRACTICES 290 (3d ed.1991)). These loans are insured by guaranty agencies, generally state and nonprofit private institutions. *Id; see also* 20 U.S.C. §§ 1071(a), 1072, 1078(b). The guaranty agencies have a contractual right against the United States for reimbursement with respect to losses on the unpaid principal balance and accrued interest on the loan. 20 U.S.C. § 1078(c). Thus, upon default, the loan is turned over by the private holder of the loan to the guaranty agency, who is reinsured by the federal government.[22]

In this case, therefore, the earliest date upon which Plaintiffs' Federal Stafford and PLUS loans could be considered claims of the United States is the earlier of (1) the date in which the government paid its reinsurance obligation or (2) the date in which the outstanding loan was assigned to the Department of Education. In the case of Plaintiff Guillermety's three Federal Stafford Loans, the Department of Education paid the guaranty agency in September 1992, May 1993, and September

1993. The loans were not assigned to the Department of Education until 1996. As such, the earliest date upon which any of Plaintiff Guillermety's Federal Stafford Loans could be considered to be a claim of the United States was September, 1992. The Treasury's offset of Guillermety's Social Security benefits in September, 1991, was, therefore, not more than 10 years from this date. Consequently, based on the record currently before the Court, section 3716(e)(1) was not violated with regard to these loans.

In the case of Plaintiff Botta's Federal PLUS Loan, the Department of Education, as noted *supra*, could not have paid the guaranty agency prior to April 30, 1993. The loan was assigned to the Department of Education on December 3, 1993. The Treasury's offset of Plaintiff Botta's Social Security benefits in October, 2001, was, therefore, not more than 10 years from either the date of assignment, or the date on which the government paid the reinsurance claim. Consequently, based on the record currently before the Court, section 3716(e)(1) was not violated with regard to this loan.

### (ii) Federal Perkins Loans

Federal Perkins Loans are low-interest loans made to students directly by the

---

the educational loan directly to the student and/or parent though the participating institution of higher education. 20 U.S.C. §§ 1807a—1087b.

**22.** The Defendants submitted the declaration of John Hilton, Branch Chief of the Chicago Contract Services Branch of the U.S. Department of Education. According to Mr. Branch, the guaranty agency (State agencies or non-profit organizations):

> promptly files a claim with Education under the reinsurance agreement. Education reimburses the guaranty agency a percentage of the losses the guaranty agency incurs in honoring default claims on qualifying

loans. After the guarantor has been reimbursed, [the guaranty agency] must try to collect the debt from the defaulter, using its own dunning letters, administrative wage garnishment (AWG), collection agency efforts and placing the defaulter into the Treasury Offset Program (TOP). The guarantor must remit to Education a corresponding percentage of any amounts it recovers directly from the defaulter. If the guaranty agency obtains no payment from the debtor for a significant period, Education may require the guarantor to assign the loan to Education.

(Def.'s Amended Resp. Br. Exh. 7.)

participating institution of higher education. 20 U.S.C. §§ 1087aa—1087ii. The loans are originated and serviced by the educational institution and repaid to the institution by the debtor. Unlike Federal Stafford and PLUS loans, the government does not insure Federal Perkins Loans. The government does, however, provide initial contributions to eligible institutions to partially capitalize a loan fund. 20 U.S.C. §§ 1087aa—1087cc. Eligible institutions may, in their discretion, refer, transfer and/or assign Perkins Loans to the Secretary of Education. 20 U.S.C. § 1087gg.

Thus, an outstanding Perkins Loan does not become a claim of the United States until the borrower's educational institution assigns, in its discretion, the delinquent loan to the Department of Education. Prior to this date, the loan is owned, serviced, and collected by the borrower's educational institution—the Government merely provides initial capital funding for Perkins Loans pursuant to 20 U.S.C. §§ 1087aa—1087cc. Plaintiff Guillermety's two Perkins Loans were assigned to the Department of Education on November 12, 1997. As with Guillermety's Federal Stafford Loans, the Treasury's offset in September, 1991, was not more than 10 years from this date. As such, based on the record currently before the Court, section 3716(e)(1) was not violated with regard to these loans.

Therefore, based on the record before the Court at this time, the Court concludes that Plaintiffs Guillermety and Botta have not established a strong likelihood of success. In fact, the Court concludes that there is a strong likelihood that Plaintiff Guillermety's and Plaintiff Botta's claims will not succeed on the merits. The Department of Education's claims, at the time the offsets were initiated, had not been outstanding for more than 10 years. Consequently, the administrative offset was specifically authorized by 31 U.S.C. § 3716(c)(3)(A)(i).

Accordingly, because the Court finds that there is a strong likelihood that Plaintiff Guillermety's and Plaintiff Botta's claims will fail on the merits, the Court DENIES Plaintiffs' motion for a preliminary injunction as to these two Plaintiffs. *Gonzales,* 225 F.3d at 625 ("Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal.") (citing *Michigan State AFL–CIO v. Miller,* 103 F.3d 1240, 1249 (6th Cir.1997)); *see also Markva v. Haveman,* 168 F.Supp.2d 695, 706 (E.D.Mich.2001).

**2. 20 U.S.C. § 1091a Does Not Eliminate the Statute of Limitations Contained in 31 U.S.C. § 3716(e)(1) With Respect to the Administrative Offset of Social Security Benefits**

The Government does not dispute that Plaintiff Edgmon's Perkins loan was assigned to the Department of Education in 1990. As such, the Treasury's offset of Edgmon's Social Security benefits in September, 1991, clearly was more than ten years from the date the loan became a claim of the United States. Consequently, the Court must now analyze Plaintiffs' complaint to determine whether there is a strong likelihood that Plaintiff Edgmon will succeed on the merits.

Plaintiffs' complaint presents an issue of first impression—the Court must decide whether the Secretary of Treasury may offset a recipient's Social Security benefits in order to collect student loans owed to the Untied States for more than 10 years. In doing so, the Court must reconcile an apparent conflict between three statutes: (1) 42 U.S.C. § 407; (2) 31 U.S.C. § 3716; and (3) 20 U.S.C. § 1091a.

42 U.S.C. § 407 provides a general prohibition against the attachment of Social Security benefits. Subsection (a) declares:

The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the monies paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

42 U.S.C. § 407(a). Subsection (b) goes on to restrict Congress' power to limit or modify this prohibition, requiring "express reference" to section 407. Specifically, subsection (b) states: "No other provision of law, enacted before, on, or after April 20, 1983, may be construed to limit, supercede, or otherwise modify the provisions of this section except to the extent that it does so by express reference to this section." 42 U.S.C. § 407(b).

Section 407 has, in fact, been expressly limited by Congress. In 1996, Congress amended 31 U.S.C. § 3716, the non-tax administrative offset provision for claims of the United States Government, expressly permitting the offset of Social Security benefits. The amendment states, in relevant part:

Notwithstanding any other provision of law (including sections 207 and 1631(d)(1) of the Social Security Act (42 U.S.C. 407 and 1383(d)(1))), ... all payments due to an individual under—

(I) the Social Security Act,

(II) part B of the Black Lung Benefits Act, or

(III) any law administered by the Railroad Retirement Board (other than payments that such Board determines to be tier 2 benefits)

shall be subject to offset under this section.

31 U.S.C. § 3716(c)(A)(i). Congress, however, retained the section's statute of limitation, which prohibits the offset of claims outstanding for more than ten years. 31 U.S.C. § 3716(e)(1) ("This section does not apply—(1) to a claim under this subchapter that has been outstanding for more than 10 years.") (previously codified at 31 U.S.C. § 3716(c)(1)).

The Government contends, however, that this provision was implicitly overridden, with respect to student loans, by Congress' earlier 1991 amendment to the Higher Education Act ("HEA"), 20 U.S.C. § 1091a, which eliminated all statutes of limitation with respect to student loan collections. Section 1091a states, in relevant part:

(1) It is the purpose of this subsection to ensure that obligations to repay loans and grant overpayments are enforced without regard to any Federal or State statutory, regulatory, or administrative limitation on the period within which debts may be enforced.

(2) Notwithstanding any other provision of statute, regulation, or administrative limitation, no limitation shall terminate the period within which suit may be filed, a judgment may be enforced, or an offset, garnishment, or other action initiated or taken by—

(D) the Secretary, the Attorney General, or the administrative head of another Federal Agency as the case may be, ... for the repayment of the amount due from a borrower on a loan made under this subchapter and part C of subchapter I of chapter 34 of Title 42 that has been assigned to the Secretary under this subchapter and part C of subchapter I of chapter 34 of title 42.

20 U.S.C. §§ 1091a(a)(1), 1091a(a)(2)(D). The Government argues that express reference to 42 U.S.C. § 407 was not necessary because the HEA did not limit or modify the Social Security Act's anti-alienation provision. Instead, the Government contends that the HEA merely overrode the ten year limitation found in 31 U.S.C. § 3716(e)(1) (formerly codified at section 3716(c)(1)), thereby extending the Treasury's authority to offset Social Security benefits in order to collect student loans outstanding for more than 10 years. The Court, however, based on the record currently before it, disagrees.

First, the statutory language of, and the legislative intent behind, the Social Security anti-alienation provision, 42 U.S.C. § 407, militates against the Government's interpretation. Section 407(a) imposes a "broad bar against the use of any legal process to reach all social security benefits." *Philpott v. Essex County Welfare Bd.*, 409 U.S. 413, 417, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973). Although, as noted by the Sixth Circuit, the committee reports discussing Title II of the Social Security Act of 1935 did not mention the anti-assignment provision, the reports do reaffirm the purpose of Title II, which was "to provide a minimum level of security against the economic uncertainties of old age." *In re Buren*, 725 F.2d 1080, 1084 (6th Cir.1984) (citing H.R.Rep. No. 615, 74th Cong., 1st Sess (1935); S.Rep. No. 628, 74th Cong., 1st Sess. (1935)). Congress' desire, implicit in the text of section 407(a), to protect social security recipients, who depend on their benefits to meet their most basic needs, is supported by the legislative history behind 42 U.S.C. § 1383(d)(1),[23] which incorporated section 407 to prohibit the attachment of Supple-

mental Social Security Income (SSI) for the aged, blind and disabled. The committee report explained:

> Your committee wishes to emphasize its strong belief that if the benefits which would be provided under this program are to meet the most basic needs of the poor, the benefits must be protected from seizure in legal processes against the beneficiary. Therefore, any amounts paid or payable under this program would not be subject to levy, garnishment, or other legal process, except the collection of delinquent Federal taxes. Also, entitlement to these benefits would not be transferable or assignable.

*In re Buren*, 725 F.2d at 1084 (quoting H.R.Rep. No. 92–231, 92d Cong., 1st Sess. 156 (1971), reprinted in [1972] U.S.C.C.A.N. 4989, 5142). These provisions illustrate a "strong Congressional opposition to the diversion of social security funds." *Id.*

Congress' intention to protect Social Security benefits from attachment was reinforced by the 1983 amendment to section 407, which added subsection (b): "No other provision of law, enacted before, on, or after April 20, 1983, may be construed to limit, supercede, or otherwise modify the provisions of this section except to the extent that it does so by *express reference* to this section." 42 U.S.C. § 407(b) (emphasis added). This amendment enhanced congressional protection of Social Security benefits by prohibiting modification or limitation of section 407's broad bar to only those instances in which Congress explicitly referenced the anti-alienation provision.

The amendment ensured, therefore, that any modification of the broad protections afforded Social Security benefits in section

---

**23.** 42 U.S.C. § 1383(d)(1) states: "The provisions of section 407 of this title ... shall apply with respect to this part to the same extent as they apply in the case of subchapter II of this chapter."

407 could only be accomplished after Congress specifically considered the effect a change would have on social security recipients, given congressional recognition that the benefits are necessary, in many instances, to meet the basic needs of the poor. Requiring "express reference" to section 407 ensured that Social Security benefits could not be unintentionally limited or modified by past or future legislation. Instead, recognizing the potential harm that may result from the attachment of Social Security benefits, section 407(b) ensured that Congress would specifically identify its intent with "express reference" to the anti-assignment statute, providing both the Government and the social security recipient with notice that benefits may be attached and the specific scope of the permissible attachment.

This interpretation is supported by the legislative history behind the 1983 amendment to section 407. Subsection (b) was enacted in response to numerous bankruptcy court decisions which permitted the attachment of Social Security benefits by a bankruptcy trustee, based on the supposed repeal by implication of section 407 by the Bankruptcy Reform Act of 1978. The House Conference Report noted:

*Present Law*

Since 1935, the Social Security Act has prohibited the transfer or assignment of any future social security or SSI benefits payable and further states that no money payable or rights existing under the Act shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

Based on the legislative history of the Bankruptcy Reform Act of 1978, some bankruptcy courts have considered social security and SSI benefits listed by the debtor to be income for purposes of

a Chapter XIII bankruptcy and have ordered SSA in several hundred cases to send all or part of a debtor's benefit check to the trustee in bankruptcy.

*House Bill*

Specifically provides that social security and SSI benefits may not be assigned notwithstanding any other provisions of law, including P.L. 95–598, the "Bankruptcy Reform Act of 1978". Effective on enactment.

Pub.L. No. 98–21, § 335(a), *reprinted in* 1983 U.S.C.C.A.N. 443; *In re Buren,* 725, F.2d 1080, 1087 (6th Cir.1984). Thus, Congress rejected repeal of section 407 by implication, restricting the scope of any limitation or modification of the broad bar contained in section 407(a) to those instances in which Congress explicitly indicated its intent to permit attachment.

The Government's interpretation—that the 1991 amendment to section 1091a implicitly eliminated the statute of limitation contained in 31 U.S.C. § 3716(e)(1) with respect to student loan collections, when Congress amended, in 1996, section 3716 permitting the limited administrative offset of Social Security benefits—is the type of unintentional expansion of an express modification which Congress attempted to eliminate when enacting 42 U.S.C. § 407(b). According to the Government's theory, once Congress expressly permits the attachment of Social Security benefits in a particular context, no matter how broad or how limited the abrogation may be, any legislation, past or future, which indirectly alters Congress' explicit limitation, should be given affect because it need not "expressly reference" section 407. Thus, according to the Government, if Congress focused its attention on section 407, and enacted a statute which provided for a narrow exception to section 407's broad bar, past or future legislation could

broaden Congress' express intention, even though expanding the government's ability to attach Social Security benefits was not contemplated or intended when the earlier or subsequent legislation was enacted/amended. This interpretation cannot be reconciled with the text of, and legislative intent behind, subsections (a) and (b) of 42 U.S.C. § 407.

Section 407(b) confines congressional limitation of section 407(a) to the specific scope contemplated by Congress when enacting the modification. Otherwise, broad and sweeping legislation, such as the Bankruptcy Reform Act of 1978, or, in this case, the broad elimination of the statute of limitations with respect to student loan collections contained in the Higher Education Act, could greatly alter the specific limitation intended by Congress, without any reference or consideration to the effect that the change would have on social security recipients, many of whom depend on their benefits to survive. This is particularly relevant in this case: when Congress amended section 1091a in 1991, the government was precluded from administratively offsetting Social Security benefits to collect claims of the United States in all circumstances. Clearly then, when Congress eliminated all statutes of limitation with respect to student loan collections in 1991, it could not have contemplated or intended that this sweeping legislation would permit the government to offset Social Security benefits in the future. Moreover, there is simply no reference in the legislative history behind the 1996 amendment to the Debt Collection Act which would indicate that Congress contemplated, when it retained the 10 year statute of limitation in subsection (e)(1) (formerly codified at section (c)(1)), that it was aware that this would be implicitly overridden, with respect to student loans, by sweeping legislation contained in the Higher Education Act, enacted approximately 5 years earlier.

This interpretation is supported by a long-standing canon of statutory construction: "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Morton v. Mancari*, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *see also United States v. Romani*, 523 U.S. 517, 530–31, 118 S.Ct. 1478, 140 L.Ed.2d 710 (1998); *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976); *United States v. Ware*, 161 F.3d 414, 423 (6th Cir.1998) ("There is an additional canon of statutory construction which dictates that the specific statute controls over the more general provision."). The Supreme Court has explained:

> The "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically addresses the topic at hand. As we recognized recently in *United States v. Estate of Romani*, "a specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it ha[s] not been expressly amended."

*Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (citations omitted). The rationale for this principle is clear: a more specific statute, enacted after a more general one, represents Congress' detailed judgment on the subject, reflecting Congress' specific

intent when "the mind of the legislature [was] turned to the details of the subject." *Radzanower*, 426 U.S. at 153, 96 S.Ct. 1989; *Romani*, 523 U.S. at 532, 118 S.Ct. 1478.

The 1991 amendment to the Higher Education Act, 20 U.S.C. § 1091a, completely eliminated, in broad and general terms, all statutes of limitation with respect to the collection of student loans. The amendment broadly stated: "It is the purpose of this subsection to ensure that obligations to repay loans and grant overpayments are enforced without regard to any Federal or State statutory, regulatory, or administrative limitation on the period within which debts may be enforced." 20 U.S.C. § 1091a(a)(1). This included actions by the Secretary for "repayment of the amount due from a borrower on a loan made under this subchapter." 20 U.S.C. § 1091a(a)(2)(D).

Congress, at this time, had yet to limit or modify section 407 with respect to the attachment of Social Security benefits. Thus, this legislation was not only sweeping in character, but, at the time it was enacted, Congress could not have contemplated that the elimination of all statutes of limitation with respect to the collection of student loans would have any impact on the government's ability to administratively offset Social Security benefits. Simply stated, when the amendment was passed, it was impossible for the government, both before and after the amendment, to offset a recipient's Social Security benefits to collect student loan obligations.

Furthermore, the legislative history surrounding the 1991 amendment to the HEA reveals that Congress was focused on eliminating a narrow problem that had recently emerged—the ability of the government to offset federal income tax refunds to collect defaulted student loans pursuant to 31 U.S.C. § 3720A. As noted by Representative Ford of Michigan, the amendment:

> overcomes a recent circuit court decision[24] that puts in jeopardy the ability of the Department of Education to collect defaulted student loans through offsets of income tax refunds and other means. In particular, the bill would eliminate the statute of limitations with respect to the recovery of defaulted student loans though offsets of Federal income tax refunds, litigation, and garnishment, where otherwise permitted by Federal law. This provision would ensure with respect to just defaulted national direct student loans that $180 million already collected through tax refund offsets would not have to be returned to defaulters, and that an additional $64.2 million per year can be collected by the Department. Substantial additional collections of defaulted guaranteed student loans are also safeguarded by this provision.

137 Cong.Rec. H1808, H1810 (Mar. 19, 1991) (statement of Rep. Ford); *see id.* at H1812 (statement of Rep. Barrett) ("Second, I'm proud to see that we are restoring the highly successful tax offset mechanism to collect on defaulted student loans.").

Thus, two critical points emerge from this analysis: (1) while the 1991 amendment to the HEA, 20 U.S.C. § 1091a, was broad and general in its textual language, it was narrowly focused on a particular problem-the ability of the federal government to collect delinquent student loans through the offset of federal tax refunds;[25]

---

**24.** *Grider v. Cavazos*, 911 F.2d 1158 (5th Cir. 1990).

**25.** At oral argument, counsel for the Government analogized to the similarities in language between section 3716 and section 3720A, which permits the administrative off-

and (2) Congress, at the time of the amendment, did not, and could not anticipate that this would have any effect on the statute of limitations with respect to the offset of Social Security benefits-the administrative offset of Social Security benefits was strictly prohibited by 42 U.S.C. § 407(a).

In 1996, however, Congress focused its attention, for the first time, squarely on the issue of the extent to which the government could offset social security funds under the Debt Collection Act, 31 U.S.C. § 3716. As noted *supra*, the 1996 amendment to section 3716 expressly limited 42 U.S.C. § 407(a), stating in relevant part:

Notwithstanding any other provision of law (including sections 207 and 1631(d)(1) of the Social Security Act (42 U.S.C. 407 and 1383(d)(1))), ... all payments due to an individual under—

(I) the Social Security Act,

(II) part B of the Black Lung Benefits Act, or

(III) any law administered by the Railroad Retirement Board (other than payments that such Board determines to be tier 2 benefits)

shall be subject to offset under this section.

set of federal tax refunds (for example, both refer generally, at times, to past-due, legally enforceable debt), and Congress' clear intent to eliminate the ten year statute of limitation with respect to the offset of federal tax refunds. However, critical differences exist between the offset of federal tax refunds, and the offset of Social Security benefits. Social Security benefits, unlike one-time federal tax refunds, are designed to provide recipients with funds to meet their most basic needs— e.g., food, shelter, medicine. More importantly, recognizing the unique nature of these benefits, Congress has tied its own hands with regard to the attachment of Social Security

31 U.S.C. § 3716(c)(A)(i). However, Congress made a specific policy decision to retain the section's statute of limitation, which prohibited the offset of claims outstanding for more than ten years. 31 U.S.C. § 3716(e)(1) (formerly codified at subsection (c)(1)); *see also* 31 C.F.R. § 285.4(c) ("Covered benefit payments, i.e., payments made to individuals under the Social Security Act ... are among the type of payments which may be offset to collect debts owed to the United States. Offset of covered benefit payments are subject to the limitations contained in this section.").

This amendment was carefully considered by Congress. In fact, it appears that Congress was aware that the amendment would allow the Treasury to administratively offset Social Security benefits to collect, among other claims, delinquent student loans. A letter entered into the Congressional Record, prepared by the Congressional Budget Office, included the following discussion:

Changes in Direct Spending. The seven-year totals in estimated savings in direct spending include about $ 475 million for new and enhanced offset authorities, including the authority to offset a portion of Social Security Administration ... payments for recipients who are delinquent on a debt owed to the federal government and who are scheduled to

benefits, explicitly precluding the attachment of social security benefits to only those instances in which Congress has explicitly modified or limited 42 U.S.C. § 407. Congressional willingness to allow for the indefinite administrative offset of federal tax refunds cannot be translated into an equal willingness to allow for the indefinite administrative offset of social security benefits, given Congress' longstanding protection of Social Security benefits in 42 U.S.C. § 407, and its continued recognition that Social Security benefits represent a preferred asset, utilized by individuals who are dependent upon them for all or a substantial portion of their income.

receive more than $10,000 in federal benefit payments over a 12–month period. For example, assume an individual currently is delinquent on a education loan and is also expected to receive $ 12,000 in Social Security and other federal payments over the next 12 months. Under the proposed language, Treasury could offset as much as $ 166 of each monthly Social Security payment and transfer this money to Education in partial satisfaction of the recipient's delinquent loan.

142 Cong. Rec. S1816, 1825 (Mar. 12, 1996). No mention, however, is made in the amendment's entire legislative history which would indicate that Congress was aware that, even though it was expressly retaining the 10 year statute of limitations previously contained in subsection(c)(1), the amendment would allow the government to offset Social Security benefits to collect outstanding student loans for an indefinite time period after they became claims of the United States.

Instead, the legislative history militates otherwise—Congress was keenly aware of the potential harm that social security recipients might face if their benefits were offset by the government. The House Conference Report stated, in relevant part:

> The conferees strongly support repayment of delinquent government debt by all those who can afford to do so. However, the conferees recognize that those who receive federal benefits, particularly Social Security benefits, may be dependent upon them for a substantial part of their income. In order to avoid unreasonable hardship, the conferees insist that any federal debt collection effort give full consideration to the financial situation of the individual who may repay the debt.

By definition, recipients of Social Security benefits are elderly or totally disabled workers and their dependents, or the surviving dependents of deceased workers. The conferees intend that in cases where such benefits are involved, it is particularly important for the Treasury Department as well as all other Executive Branch organizations involved in developing regulations to implement this provision, to create regulatory safeguards which separate those debtors who cannot repay from those who refuse to repay. In particular, those who have become delinquent because of personal hardship, such as debilitating disability, or death of the breadwinner, and who may therefore be unable, rather than unwilling, to repay, must be protected if administrative offset of those benefits would cause undue financial hardship. Such safeguards are critical when benefits such as Social Security are the sole or major source of income for the debtor.

> The conferees want to ensure that the Department of the Treasury regulations governing new debt collection procedures will be cautiously and thoughtfully implemented, providing full safeguards for beneficiaries. Recognizing the dependence of those receiving federal benefits on those benefits, the conferees direct that the Treasury Department limit automatic withholdings of benefits above the $9,000 annual exemption to a reasonable percentage of those benefits, not to exceed 15 percent. Of course, debtors wishing to repay more would be free to do so by remittance or other voluntary means.

H.R. Conf. Rep. No. 104–537, 104th Cong., 2d Sess., 142 Cong. Rec. H3842, H4042–43 (Apr. 25, 1996).

Thus, even though Congress was willing to permit government offset of social secu-

rity benefits, it expressed reservation in doing so, wisely recognizing the potential harm that might result to recipients who depended on these payments. Congress dictated that regulations should be "cautiously and thoughtfully implemented," given the critical nature of the benefits. Moreover, it expressly retained the ten year statute of limitations previously codified at 31 U.S.C. § 3716(c)(1), preventing the offset of Social Security and other benefits for claims which had been long outstanding. The unbridled ability to offset social security benefits was not intended by Congress.[26]

It is clear, therefore, that the mind of the legislature was squarely fixed on the scope of the government's ability to offset Social Security benefits when it amended 31 U.S.C. § 3716 in 1996. This was the first time Congress specifically addressed the issue in specific detail, balancing the important governmental goal of collecting delinquent government debt with the tremendous harm that might result from the reduction of Social Security benefits which recipients depend upon to meet their most basic needs. In doing so, Congress authorized the offset of Social Security benefits while, at the same time, cautioning that regulations must be cautiously implemented and specifically retaining the ten year statute of limitations.

Therefore, as noted *supra,* the longstanding canon of statutory construction— "Where there is no clear intention other-

wise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment"— militates in favor of the Plaintiffs' statutory interpretation. The 1996 amendment represented Congress' detailed judgment in the area of the Government's ability to offset Social Security benefits, enacted when the mind of the legislature was clearly turned to the subject. The earlier 1991 amendment to 20 U.S.C. § 1091a should not nullify Congress' later detailed amendment on the subject. Section 1091a is a general statute, enacted five years earlier, in a different statutory scheme—the Higher Education Act. It broadly eliminated all statute of limitations with respect to student loan collections. However, at the time it was enacted, Congress could not have anticipated that it would have any effect on the offset of Social Security benefits—it was strictly prohibited at that time by 42 U.S.C. § 407.

Applying this longstanding rule of statutory construction, the Court, based on the record currently before it, concludes that the broad and general provision of section 1091a cannot implicitly override the specific and detailed provisions contained in section 3716, where Congress was clearly focused on the extent to which the government could offset Social Security benefits to collect claims of the United States, including claims for defaulted student loans. This conclusion is supported, as noted *supra,* by the statutory language and legislative intent behind the Social

---

**26.** In fact, the Treasury regulations dealing with the special rules applicable to the offset of Social Security benefits counsels otherwise. The regulations state:

Covered benefit payments, i.e., payments made to individuals under the Social Security Act (other than Supplemental Security Income (SSI) payments, part B of the Black Lung Benefits Act, or any law administered by the Railroad Retirement Board (RRB)

(other than tier 2 benefits) are among the type of payments which may be offset to collect debts owed to the United States). *Offset of covered benefit payments are subject to the limitations contained in this section.* 31 C.F.R. § 285.4(c) (emphasis added). No mention is made of 20 U.S.C. § 1091a, or any other sweeping statutory exception to this limitation.

Security anti-attachment provision, which attempted to eliminate the type of unintentional expansion of an express congressional limitation of 42 U.S.C. § 407 that the Defendants seek in this case.

Therefore, based on the record currently before the Court, the Court finds that Plaintiff Edgmon has shown a strong likelihood of success on the merits. Edgmon's loan was assigned to the Department of Education in March, 1990, more than ten years before the offsets began. As such, the government was prohibited from offsetting Edgmon's Social Security benefits pursuant to 31 U.S.C. § 3716(e)(1).

### D. Irreparable Harm to Plaintiff Edgmon Outweighs Harm to Government

The Government argues that Plaintiff Edgmon will not suffer irreparable harm because his annual income, although only slightly above the poverty level, will not fall below the $9,000 minimum level set forth by Congress in 31 U.S.C. § 3716(c)(3)(A)(ii). The Government also argues that "it is well settled that 'the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury,'" citing *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974).

As an initial matter, *Sampson* does not stand for the proposition that a temporary loss of income is never sufficient to establish irreparable injury. Instead, *Sampson* held that a loss of income "usually" does not constitute irreparable injury. The Court noted:

"The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory

or other corrective relief will be available at a later date, in ordinary course of litigation, weighs heavily against a claim of irreparable harm."

*Id.* at 90, 94 S.Ct. 937 (quoting *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921 (D.C.Cir.1958)) (emphasis in original). In fact, several courts have found that a reduction in benefits which were necessary to purchase a recipient's basic necessities was sufficient to establish irreparable harm. *Chu Drua Cha v. Noot*, 696 F.2d 594, 599 (8th Cir.1982) ("For people at the economic margin of existence, the loss of $172 a month and perhaps some medical care cannot be made up by the later entry of a money judgment."); *see also In re Orthopedic Bone Screw Products Liability Litigation*, 202 F.R.D. 154, 161–62 (E.D.Pa.2001); *Brown v. Giuliani*, 158 F.R.D. 251, 264–65 (E.D.N.Y.1994).

This case does not present the usual situation. Plaintiff Edgmon, a sixty-five year-old man confined to a wheelchair, depends on fixed Social Security benefits as his sole source of income. His annual pre-offset benefits of approximately $10,200 per year ($849 per month) is barely sufficient to enable Plaintiff to purchase his basic necessities—food, electricity, propane for heat, insurance, taxes, and clothing. (Edgmon Affidavit ¶ 6, 8.) In fact, Plaintiff has been forced to rely on whatever is left over after paying his monthly expenses to purchase groceries. (*Id.*)

The government's offset of $99 per month, reduces Mr. Edgmon's annual Social Security benefits by 12%, to exactly $9,000 annually, which is only slightly above the poverty level. A $99 monthly reduction may not be significant to the Government, or for that matter, to a large segment of the American population—however, a 12% reduction in Mr. Edgmon's monthly benefits could be detrimental to his basic survival. The Court cannot ac-

cept the Government's contention that irreparable harm cannot exist because Mr. Edgmon receives the $9,000 minimum enumerated in section 3716. Mr. Edgmon's fulls benefits are barely sufficient to meet his most basic needs, any further reduction in his benefits would most likely result in irreparable harm to Mr. Edgmon.

Furthermore, contrary to the Government's contention that the weighing of harm between one plaintiff and the government is "lopsided," the Court finds that the harm to Mr. Edgmon is not outweighed by the harm to the United States. Mr. Edgmon faces the loss of income necessary to meet his most basic needs. The Government, on the contrary, will merely suffer the temporary loss of an offset for a few months—oral argument for Plaintiffs' motion for summary judgment is scheduled for May 7, 2002. This loss will have no meaningful effect on the Treasury. Moreover, interest will continue to accrue on Mr. Edgmon's outstanding loan during this brief time period.[27]

Consequently, the Court concludes that a preliminary injunction is warranted with respect to Plaintiff Edgmon. He has demonstrated a strong likelihood of success as well as irreparable harm. Accordingly, the Court GRANTS Plaintiff Edgmon's motion for a preliminary injunction. Accordingly, until further Order of the Court, the Secretary of Treasury of the United States is hereby RESTRAINED and ENJOINED from undertaking any administrative offset of Plaintiff Glenn D. Edgmon's Social Security benefits to collect his outstanding Federal Perkins Loan.

### E. Federal Rule of Civil Procedure 65(c)—Bond is Unnecessary

Federal Rule of Civil Procedure 65(c) states, in relevant part:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof.

Fed.R.Civ.P. 65(c). While a district court must consider whether security is appropriate, the court need not actually require security—instead, the decision is left to the sound discretion of the court. *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir.1978); *see also Moltan Co. v. Eagle–Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir.1995) ("While we recognize that the language of Rule 65(c) appears to be mandatory, and that many circuits have so interpreted it, the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security.").

For the reasons noted *supra*, the Court does not believe that the posting of security is necessary in this case, given Plaintiff Edgmon's strong likelihood of success and his financial inability to pay a bond. *See Sluiter v. Blue Cross and Blue Shield of Michigan*, 979 F.Supp. 1131, 1145 (E.D.Mich.1997).

### CONCLUSION

For the reasons stated, the Court (1) DENIES Plaintiffs' motion for preliminary injunction with respect to Plaintiffs Guil-

---

**27.** The public interest does not favor either party. Certainly, there is a strong public interest in government's collection of delinquent debt, including defaulted student loans.

However, as expressed by 42 U.S.C. § 407, there is an equally strong public interest in protecting Social Security benefits from unauthorized attachment.

lermety and Botta; and (2) GRANTS Plaintiffs' motion for preliminary injunction with respect to Plaintiff Edgmon. Accordingly, IT IS ORDERED that, until further Order of the Court, the Secretary of Treasury of the United States is hereby RESTRAINED and ENJOINED from undertaking any administrative offset of Plaintiff Glenn D. Edgmon's Social Security benefits to collect his outstanding Federal Perkins Loan. The Court reiterates, however, that the instant ruling does not prevent the government from proceeding with its lawsuit against Plaintiff Edgmon for sums owed to the government.

SO ORDERED.